IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ronald Allen Clarke, | ) | C/A No.: 1:15-4735-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On August 8, 2013, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on July 15, 2011. Tr. at 75, 73, 185–89, and 190–

95. His applications were denied initially and upon reconsideration. Tr. at 117–20, 121–24, 128–31, and 132–35. On June 11, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 23–40 (Hr'g Tr.). The ALJ issued a partially-favorable decision on August 10, 2015, finding that Plaintiff became disabled within the meaning of the Act on June 11, 2015. Tr. at 9–22. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 24, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 54 years old at the time of the hearing. Tr. at 18. He completed the eleventh grade. *Id.* His past relevant work ("PRW") was as a construction worker. Tr. at 54. He alleges he has been unable to work since July 15, 2011. Tr. at 185.

2.    Medical History

Plaintiff presented to Moncks Corner Medical Center on August 8, 2012, with nausea and vomiting. Tr. at 302. A physical examination revealed mild left-sided abdominal tenderness, but no other abnormalities. Tr. at 304. A computed tomography ("CT") scan of Plaintiff's abdomen showed acute pancreatitis. Tr. at 303.

Plaintiff followed up with Gregory Cain, M.D. ("Dr. Cain"), for medication refills on May 15, 2013. Tr. at 324. He reported improvement in his depressive symptoms with the addition of Venlafaxine, but requested a slightly higher dosage. *Id.* He stated his back

pain was well-controlled with use of Lortab as needed. *Id.* He complained of some insomnia and requested medication to treat it. *Id.* Dr. Cain observed no abnormalities on physical examination. *Id.* He increased Plaintiff's dosage of Velafaxine to 75 milligrams, prescribed Ambien for insomnia, and refilled prescriptions for Lortab and Lisinopril-Hydrocholorothiazide. Tr. at 324–25.

On October 3, 2013, Plaintiff indicated he had mild symptoms of depression and anxiety that included anhedonia, insomnia, fatigue, feelings of guilt or worthlessness, impaired concentration, and crying spells. Tr. at 318. He reported moderate back pain, but indicated it was stable on his medications. Tr. at 319. Dr. Cain observed Plaintiff to have paralumbar and parathoracic tenderness and decreased range of motion ("ROM") with extension, lateral bending, and rotation. Tr. at 320. Plaintiff had normal gait, strength, sensation, and deep tendon reflexes in his bilateral extremities. *Id.* Dr. Cain indicated depression, insomnia, osteoarthritis, and hypertension were stable. Tr. at 320–21. He prescribed Lortab 10-500 milligrams and Lisinopril-Hydrochlorothiazide 20-12.5 milligrams and instructed Plaintiff to follow up in two months. Tr. at 321.

On October 11, 2013, Plaintiff presented to Trident Health Systems with syncope and dizziness. Tr. at 290. He reported left-sided chest pain and generalized weakness. *Id.* He denied neck pain, thoracic pain, lumbar pain, extremity pain, and extremity swelling. Tr. at 291. Plaintiff had full and painless ROM of his neck, back, and extremities. Tr. at 292. He demonstrated normal gait and had no neurological abnormalities. *Id.* A chest x-ray, electrocardiogram ("EKG"), electrocardiography ("ECG"), lab work, and a

computed tomography ("CT") scan of his head were normal. Tr. at 294. The attending physician diagnosed vertigo, chest wall pain, and dehydration. Tr. at 295.

Plaintiff followed up with Dr. Cain for vertigo on November 7, 2013. Tr. at 315. He reported occasional episodes of dizziness and unsteady gait that lasted for minutes at a time. *Id.* He endorsed pain in his bilateral shoulders. *Id.* He complained of tenderness to palpation in the bicipital groove and humeral head of his left shoulder. Tr. at 317. Dr. Cain observed that Plaintiff's left shoulder ROM was decreased. *Id.* Plaintiff had normal strength, sensation, and reflexes in his bilateral upper and lower extremities. *Id.* Dr. Cain described him as having an anxious mood with a normal affect. *Id.* He administered a corticosteroid injection to Plaintiff's left shoulder and refilled his medications. *Id.*

Plaintiff presented to Trident Health Systems on December 1, 2013, with chronic shoulder pain. Tr. at 285. The attending physician observed Plaintiff to have full ROM of his neck and painless ROM of his back. Tr. at 287. Plaintiff demonstrated tenderness to palpation, decreased ROM, and pain with external rotation of his left shoulder. *Id.* An x-ray of the left shoulder revealed minimal glenohumeral and moderate acromioclavicular ("AC") joint arthropathy. *Id.* The attending physician diagnosed likely rotator cuff/shoulder impingement syndrome. *Id.*

On December 17, 2013, J'Wanna D. Spann, MA ("Ms. Spann"), indicated Plaintiff had sought mental health services for "depression, low energy, loss of interest in pleasurable activities, and massive health problems." Tr. at 338. She stated Plaintiff's health problems were likely a major contributor to his depressed mood and indicated

Plaintiff had made no progress toward improving his mental health because he was seeking treatment for his physical complaints. *Id.*

On January 13, 2014, Plaintiff requested refills of his medications for osteoarthritis, hypertension, and anxiety. Tr. at 312. Plaintiff assessed his pain as moderate and indicated it was controlled by his medications. *Id.* He stated he was not satisfied with his treatment for anxiety and requested that Dr. Cain prescribe a medication to be taken as needed. Tr. at 313. Dr. Cain observed Plaintiff to have paralumbar tenderness and decreased lumbar extension, lateral bending, and rotation. Tr. at 314. However, he noted Plaintiff had normal deep tendon reflexes, strength, and sensation and that a musculoskeletal exam otherwise revealed normal ROM, symmetry, tone, and strength. *Id.* He prescribed Xanax and refilled Plaintiff's other medications. *Id.*

On January 14, 2014, state agency consultant Leslie Burke, Ph. D. ("Dr. Burke"), completed a psychiatric review technique form ("PRTF") and considered Listing 12.04 for affective disorders. Tr. at 46–47. She assessed Plaintiff as having moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* She performed a mental residual functional capacity ("RFC") assessment and indicated Plaintiff was moderately limited with regard to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal

workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 52–54.

Plaintiff presented to Berkeley Mental Health Center on January 24, 2014, for an initial mental assessment. Tr. at 333–34. He indicated he was out of medications and had previously been cutting his dose in half to make the medication last longer. Tr. at 333. He complained of being "very depressed"; having "lots of anxiety"; experiencing panic attacks; avoiding crowds and public places; being angry with and yelling at others; neglecting his hygiene; experiencing sleep disturbance; and having poor energy and variable appetite. Id. Kristi West, DNP, APRN ("Ms. West"), performed a mental status examination and observed Plaintiff to have fair insight and judgment. Tr. at 333–34. She noted no other abnormalities on examination. Id. She assessed recurrent, moderate major depressive disorder. Tr. at 334.

Plaintiff presented to Temisan L. Etikerentse, M.D. ("Dr. Etikerentse"), for a consultative examination on January 28, 2014. Tr. at 472–75. He endorsed low back pain that radiated down his left leg and indicated it had progressively worsened over the prior six-month period. Tr. at 472. He reported pain in his left arm and knees. Id. Plaintiff demonstrated normal ROM of his cervical spine. Tr. at 474. He had normal grip strength in his right hand, but his left grip strength was reduced to 4/5. Id. Dr. Etikerentse noted

6

Plaintiff had difficulty with fine movements; tenderness to palpation, positive straight-leg raising ("SLR") test at 70 degrees on the left; and demonstrated normal ROM of his hips, knees, ankles, and the small joints of his feet. *Id.* Plaintiff also had decreased ROM of his left shoulder. Tr. at 470. Dr. Etikerentse assessed controlled hypertension, difficulty hearing, back pain, possible left rotator cuff tear, and mild degenerative joint disease of the bilateral knees. Tr. at 474–75.

On February 24, 2014, an x-ray of Plaintiff's right knee showed an irregular medial tibial plateau that was likely either degenerative or related to a prior osteochondral injury, as well as quadriceps enthesophytic spur formation. Tr. at 327.

State agency medical consultant Rebecca Meriwether, M.D. ("Dr. Meriwether"), completed a physical RFC assessment on March 7, 2014, and indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; unable to lift overhead with the left upper extremity; frequently able to handle and finger with the left hand; and must avoid concentrated exposure to hazards. Tr. at 49–52.

Plaintiff presented to Dr. Cain's office for medication refills on April 8, 2014. Tr. at 344. He reported doing "fairly well," and the provider[1] noted his impairments were stable on examination. *Id.*

---

[1] The treatment note indicates the provider to be "cfw," but the identity of this provider is unclear from the record. Tr. at 344.

Plaintiff presented to Anthony D. Poole, PA ("Mr. Poole"), in Dr. Cain's office on April 16, 2014, and reported that he had been approved for Medicaid and desired to establish regular treatment. Tr. at 345. He reported worsened mental health symptoms after undergoing cognitive behavioral therapy. *Id.* He complained of frequent agitation and stated Celexa was not helping his symptoms. *Id.* He indicated his pain was exacerbating his depression. *Id.* Mr. Poole observed Plaintiff to be intermittently tearful and to appear mildly anxious. *Id.* He discussed the matter with Dr. Cain and they agreed to change Plaintiff's medication to Effexor and to refer him to James H. Way, Ph. D. ("Dr. Way"), for counseling. Tr. at 346. He initially prescribed 75 milligrams of Effexor, but indicated the dosage would be titrated to 150 milligrams after two weeks. *Id.*

On April 22, 2014, Plaintiff presented to Lowcountry Orthopaedics, and reported severe pain in his low back, neck, and shoulders that was exacerbated by all activities. Tr. at 363. He complained of numbness in his left hand and fingers that worsened at night and caused him to drop items. Tr. at 364. He indicated Lortab was providing little relief. *Id.* Christopher A. Merrell, M.D. ("Dr. Merrell"), observed Plaintiff to have paracervical and lumbar tenderness to palpation; pain with cervical and lumbar ROM; decreased sensation of the radial forearm, thumb, and index finger at C5-6; positive Spurling's test; and antalgic gait. Tr. at 365. He prescribed 300 milligrams of Gabapentin and referred Plaintiff for lumbar and cervical magnetic resonance imaging ("MRI") and electromyography ("EMG") and nerve conduction studies ("NCS") of his left upper extremity. Tr. at 365–66. He diagnosed cervical radiculitis, cervical spondylosis without

8

myelopathy, degeneration of lumbar intervertebral disc, and lumbar spondylosis without myelopathy. *Id.*

On May 6, 2014, Plaintiff reported Gabapentin caused him to "feel drunk." Tr. at 361. Dr. Merrell stated the MRI of Plaintiff's cervical spine showed a rightward disc protrusion at C4-5 and degenerative disc disease at C5-6 and the MRI of his lumbar spine indicated leftward disc herniation at L4-5 and L5-S1. Tr. at 362. He decreased Plaintiff's dosage of Gabapentin, replaced Lortab with Percocet, and recommended cervical and lumbar epidural steroid injections ("ESIs"). Tr. at 362–63. On May 8, 2014, he administered a left C7-T1 translaminar ESI. Tr. at 369–70.

On May 20, 2014, Dr. Merrell observed the following abnormalities on examination: paracervical and lumbosacral tenderness to palpation; pain with cervical and lumbar ROM; decreased sensation in the C6 dermatome to radial forearm, thumb, and index finger; antalgic gait; and positive Spurling's test. Tr. at 358–59. He stated "[a]t this time[,] I do not feel that he is able to work in any capacity due to pain." Tr. at 360. Dr. Merrell administered bilateral L5-S1 transforaminal ESIs on May 22, 2014. Tr. at 367–68. On May 27, 2014, Dr. Merrell noted the same abnormalities on physical examination that he indicated during the prior week's visit. Tr. at 355–56. He stated an EMG showed C5 radiculopathy and bilateral carpal tunnel syndrome, right worse than left. Tr. at 356. He referred Plaintiff to William E. Wilson, M.D. ("Dr. Wilson"), for a cervical surgical consultation, ordered carpal tunnel braces, and refilled his medications. *Id.*

Plaintiff presented to Dr. Way on May 28, 2014. Tr. at 403–04. He reported symptoms that included depressed mood, decreased interest, decreased pleasure, agitation, feelings of worthlessness, irritability, decreased concentration, tearfulness, helplessness, hopelessness, and anxiety. Tr. at 403. He indicated he was withdrawn and had difficulty being around crowds. *Id.* Dr. Way described Plaintiff as having adequate grooming; being appropriately dressed; maintaining good eye contact; demonstrating restlessness; having normal speech with an irritable tone; demonstrating a depressed and irritable mood; having a restricted affect; demonstrating logical thought processes; and being tearful. Tr. at 404. He diagnosed recurrent, moderate depression. *Id.*

On May 29, 2014, Mr. Poole observed Plaintiff to have paracervical tenderness to palpation and to be using bilateral wrist splints. Tr. at 407. Plaintiff requested medication for smoking cessation, and Mr. Poole refilled Plaintiff's medications and prescribed Nicoderm patches. *Id.*

Plaintiff presented to Dr. Wilson on June 4, 2014, with complaints of severe neck pain and numbness and tingling throughout his right arm. Tr. at 439–40. He indicated his symptoms had worsened over the prior four-month period. Tr. at 440. Dr. Wilson observed Plaintiff to have bilateral paracervical and trapezii tenderness; pain with cervical ROM; diminished reflexes; decreased deltoid abduction and biceps flexion on the right; decreased sensation of the outer upper arm at C5; decreased sensation of the radial forearm, thumb, and index finger at C6; and positive Spurling's test. Tr. at 442. He discussed possible surgical intervention and instructed Plaintiff that he would need surgical clearance from his primary care physician. Tr. at 443.

Berkeley Community Mental Health Center closed Plaintiff's case on June 16, 2014, per his request. Tr. at 414. Ms. Spann indicated Plaintiff had made little progress in meeting his mental health goals because of his physical complications. *Id.*

Janet Boland, Ph. D., ("Dr. Boland"), assessed the same degree of functional impairment as Dr. Burke on June 17, 2014. Tr. at 83. She indicated Plaintiff was moderately limited with respect to most of the same functions that Dr. Burke indicated, but found that he was not significantly limited in his ability to set realistic goals or make plans independently of others. Tr. at 90–92.

On June 17, 2014, Plaintiff presented for a pre-operative evaluation. Tr. at 439. Christopher S. Schafer, PA-C ("Mr. Schafer"), observed Plaintiff to have bilateral paraspinal and trapezii tenderness; pain with extension and rotation; and 5/5 strength in the bilateral upper extremities, with the exception of 4/5 strength in the biceps and with right deltoid abduction. *Id.* He indicated Plaintiff had diminished reflexes in the bilateral biceps and triceps and diminished sensation to the C5-6 dermatome on the right. *Id.* He discussed the surgical option and possible complications with Plaintiff, and Plaintiff elected to proceed with C4-5 and C5-6 anterior cervical discectomy and fusion with instrumentation and bone grafting. *Id.* Dr. Wilson performed the surgery on June 23, 2014, without complications. Tr. at 427–29.

On July 8, 2014, Plaintiff complained of generalized pain in his neck, as well as pain in his bilateral trapezii and shoulders. Tr. at 435. He reported numbness in his bilateral hands. *Id.* Mr. Schafer observed Plaintiff to have swelling, tenderness, and limited active ROM. Tr. at 436. An x-ray revealed Plaintiff's hardware to be intact and in

11

good position. Tr. at 436. Mr. Schafer instructed Plaintiff on active ROM exercises and encouraged him to engage in them. *Id.*

On July 29, 2014, state agency medical consultant Michele Spero, M.D. ("Dr. Spero"), assessed the same limitations as Dr. Meriwether, except she stated Plaintiff should not lift overhead with either upper extremity and should limit handling and fingering to frequent with the bilateral hands. Tr. at 87–90.

On August 5, 2014, Plaintiff complained of loss of ROM and pain in his interscapular area, bilateral upper arms, and low back. Tr. at 459. Dr. Wilson observed Plaintiff to have no swelling, tenderness, or warmth and to be neurovascularly intact, but to have limited active ROM. Tr. at 460. He ordered physical therapy. Tr. at 461. He indicated Plaintiff's work status was "off work" and that Plaintiff would be unable to return to work for an indeterminate amount of time. *Id.*

Plaintiff presented to Kathryn B. Conner, PA-C ("Ms. Conner"), for bilateral hand pain on August 11, 2014. Tr. at 456. He reported grip weakness and neck pain with radiation. *Id.* An x-ray of Plaintiff's hand revealed diffuse osteoarthritis. Tr. at 458. Ms. Conner reviewed the treatment options, and Plaintiff elected to proceed with surgery. *Id.*

Keith Santiago, M.D. ("Dr. Santiago"), performed right carpal tunnel release surgery and administered a left carpal tunnel corticosteroid injection on September 4, 2014. Tr. at 464–65.

On September 16, 2014, Plaintiff complained of decreased ROM in his upper extremities and pain in his bilateral shoulders, upper arms, low back, and bilateral legs. Tr. at 453–54. Dr. Wilson assessed bilateral shoulder impingement and indicated he

12

would refer Plaintiff to a shoulder surgeon. Tr. at 455. He indicated Plaintiff should consult with a pain management physician and would likely need lumbar surgery in the future. *Id.*

Plaintiff reported decreased symptoms of carpal tunnel syndrome on September 17, 2014. Tr. at 451. Dr. Santiago indicated Plaintiff's incision demonstrated no signs of infection and that Plaintiff had full finger extension. Tr. at 453. He recommended scar massage and finger and wrist ROM and strengthening exercises. *Id.*

On September 22, 2014, Plaintiff presented to David H. Jaskwhich, M.D. ("Dr. Jaskwhich"), for shoulder pain that was accompanied by weakness and worse on the left than the right. Tr. at 550–51. Dr. Jaskwhich observed Plaintiff to have tenderness in the glenohumeral joint region of his left shoulder; limited active ROM on the left; forward flexion with passive ROM limited to 110 degrees on the right and 90 degrees on the left; positive Neer's test; positive O'Brien's test, and flexion and abduction limited to 4/5 on the left. Tr. at 552. He assessed shoulder pain and a full thickness rotator cuff tear; referred Plaintiff for an MRI; and discussed possible surgery. Tr. at 552–53.

Plaintiff followed up with Dr. Merrell on September 25, 2014. Tr. at 547. He reported difficulty standing and walking as a result of pain in his back, posterior calf, and thigh. Tr. at 548. Dr. Merrell indicated Plaintiff was unable to tolerate Morphine. Tr. at 550. He prescribed Gabapentin and Percocet and advised Plaintiff that he must discontinue use of marijuana and should only obtain pain medications through Lowcountry Orthopaedics. *Id.* He administered a lumbar transforaminal ESI at L5-S1. *Id.*

On October 6, 2014, Dr. Santiago observed Plaintiff to have a well-healed scar and full finger ROM. Tr. at 547. Plaintiff expressed a desire to proceed with left carpal tunnel release surgery, and Dr. Santiago indicated he would schedule the surgery in the near future. *Id.*

Dr. Merrell administered bilateral L5-S1 transforaminal ESIs on October 9, 2014. Tr. at 561–62.

Plaintiff presented to Kelly L. Merrell, ANP-BC ("Ms. Merrell"), for a medication visit on October 23, 2014. Tr. at 541. Ms. Merrell continued Plaintiff's prescriptions for 300 milligrams of Gabapentin, to be taken at bedtime, and 10 milligrams of Percocet, to be taken up to four times per day. Tr. at 544.

Plaintiff complained of neck pain on October 28, 2014. Tr. at 538. Dr. Wilson indicated Plaintiff's cervical fusion was healing. Tr. at 540. An x-ray of Plaintiff's lumbar spine showed spondylosis from L3 to S1 and disc space collapse at L4-5 and L5-S1. Tr. at 563. Dr. Wilson discussed with Plaintiff the possibility of lumbar surgery. Tr. at 540.

On October 31, 2014, Dr. Jaskwhich indicated an MRI of Plaintiff's left shoulder showed evidence of a partial tear of the supraspinatus and subscapularis and damage to the biceps tendon. Tr. at 538. He stated he would address Plaintiff's shoulder problems, if necessary, after he underwent surgery to his lumbar spine. *Id.*

On November 3, 2014, Plaintiff presented to David Rodgers, M.D. ("Dr. Rodgers"), to establish treatment. Tr. at 487. He indicated problems that included dizziness, constipation, neck pain, chronic back pain, numbness in his bilateral hands,

anxiety, and depression. *Id.* Dr. Rodgers noted Plaintiff used a cane. Tr. at 488. He prescribed medication for hypertension and discussed smoking cessation. Tr. at 489.

On November 21, 2014, Dr. Wilson indicated Plaintiff had bilateral ankle weakness, L5 sensory changes, and positive SLR test. Tr. at 535. He discussed with Plaintiff the risks and possible complications of surgery. *Id.*

On December 16, 2014, Dr. Merrell refilled Plaintiff's prescription for Gabapentin and prescribed Hydromorphone for pain in light of his upcoming surgery. Tr. at 530.

Plaintiff underwent anterior lumbar discectomy, decompression, and interbody fusion at L4-5 and L5-S1 on December 22, 2014. Tr. at 554–60.

Plaintiff presented to Tabatha Adams, FNP ("Ms. Adams"), on December 29, 2014. Tr. at 483. He reported constant thirst, urinary frequency, back pain, and constant ringing in his ears. *Id.* Ms. Adams observed Plaintiff to be ambulating with a cane and wearing a back brace. Tr. at 484 and 485. She diagnosed tinnitus and hearing loss and referred Plaintiff to an ear, nose, and throat specialist. Tr. at 485.

Dr. Wilson indicated Plaintiff's condition was stable on January 9, 2015. Tr. at 526. He recommended Plaintiff use a laxative to treat constipation. *Id.*

Plaintiff described his depression as moderate and not well-controlled on January 14, 2015. Tr. at 480. He complained that the ringing in his ears was worsening and requested an earlier appointment with a specialist. *Id.* He also reported urinary frequency, constant thirst, back pain, and numbness and weakness in his right hand. *Id.* Dr. Rodgers observed Plaintiff to be ambulating with a walker. Tr. at 481. He noted Plaintiff had

15

painful ROM and decreased grip strength in his right wrist and that he was unable to fully extend his fingers or make a full fist. *Id.*

Plaintiff presented to Ronald McVicar, D.O., F.A.C.S. ("Dr. McVicar"), on January 20, 2015. Tr. at 498–99. He reported progressive hearing loss and some difficulty with speech comprehension and use of the telephone. Tr. at 498. He complained of bilateral high-pitched tinnitus. *Id.* Audiologic testing revealed Plaintiff to have moderate-to-severe downsloping bilateral sensorineural hearing loss with a 40 to 50 decibel speech reception threshold and type C tympanometry with mild negative pressure of -20 to -35. Tr. at 499. Dr. McVicar recommended Plaintiff apply to receive a hearing aid and discussed options for treatment of tinnitus. *Id.*

On January 26, 2015, Dr. Jaskwhich indicated the MRI of Plaintiff's left shoulder showed some fraying and degeneration of the tendon and labrum. Tr. at 524. He stated he would not consider performing shoulder surgery for another three months because Plaintiff was continuing to recover from lumbar surgery. *Id.* He directed Plaintiff to follow up in six weeks for a steroid injection to his shoulder. *Id.*

On February 20, 2015, Dr. Wilson indicated Plaintiff's surgical wounds were clean and dry; that he demonstrated appropriate ROM; and that he was neurovascularly intact. Tr. at 521. Plaintiff complained of left hip pain with passive ROM, but he had no crepitus. *Id.* Dr. Wilson recommended Plaintiff wean out of his back brace, continue core strengthening exercises, and follow up for x-rays in two months. *Id.*

On March 9, 2015, Plaintiff complained of muscle aches and weakness, joint pain, and back pain. Tr. at 518. Dr. Jaskwhich observed Plaintiff to be tender in his

glenohumeral joint region; to have limited active and passive ROM of his left shoulder; to have positive O'Brien's and Neer's tests; and to have 4/5 left shoulder abduction and flexion. *Id.* He administered a Depo-Medrol and Marcaine injection. Tr. at 519. Dr. Jaskwhich indicated Plaintiff would require arthroscopic surgery for right shoulder bursitis. Tr. at 476. He stated the surgery would improve Plaintiff's shoulder pain, but that Plaintiff would continue to be limited in his ability to lift. *Id.*

On April 7, 2015, Plaintiff reported he continued to experience neck pain with radiation; had received no relief through occupational therapy; and had fallen onto his right hand two weeks earlier. Tr. at 513. Dr. Santiago observed Plaintiff to have an "unusual right hand tremor"; full finger extension, except for a 10-degree proximal interphalangeal lag and a two-centimeter tip to palm distance with finger flexion; and reduced right grip strength. Tr. at 515. He indicated Plaintiff's symptoms were concerning in light of the fact that he had undergone right carpal tunnel release seven months earlier and suggested they may be related to cervical radiculopathy. *Id.* After discussing treatment options, Plaintiff agreed to proceed with new EMG and NCS. *Id.*

On April 14, 2015, Plaintiff reported weakness and pain that radiated down his legs, but was worse on the left than the right. Tr. at 509. Dr. Merrell observed Plaintiff to have paracervical and lumbosacral tenderness; to ambulate with an antalgic gait; to have decreased sensation in the right radial forearm, thumb, and index finger; and to endorse pain with active ROM. Tr. at 511. He noted Plaintiff had normal motor strength. *Id.* Dr. Merrell indicated Plaintiff should continue taking 10 milligrams of Percocet. Tr. at 512. He stated Plaintiff had applied for disability and that he supported that decision. *Id.*

17

On May 26, 2015, Plaintiff underwent left shoulder arthroscopy with extensive debridement of the labrum, synovial tendon, and bursa. Tr. at 575–81.

C.    The Administrative Proceedings

1.    The Administrative Hearing

At the hearing on June 11, 2015, Plaintiff testified he had undergone left rotator cuff surgery during the prior month. Tr. at 26–27. He stated he had also undergone carpal tunnel release and surgeries to his neck and back. Tr. at 27. He indicated he received mental health treatment for severe depression, anxiety, and panic attacks. *Id.* He stated he was no longer able to function in crowds and preferred to be alone. Tr. at 27–28.

Plaintiff testified he left his construction job in July 2013 because he was experiencing problems with vertigo that caused him to pass out. Tr. at 29. Upon further questioning, Plaintiff admitted that he was laid off from the job in July 2013 because "the economy went bad." *Id.* He indicated he drew unemployment benefits after he was laid off from the job. Tr. at 30. He stated he was unable to visit doctors to determine what was wrong until he obtained insurance coverage. *Id.*

Plaintiff testified he initially developed problems with his back and neck, but later developed problems with his arms. Tr. at 34. He stated his primary care physician prescribed pain medications before he was able to obtain additional treatment. *Id.* He indicated the surgeries had resulted in no improvement. Tr. at 38. He stated Dr. Merrell had prescribed a cane and that he had been using it for approximately a year. Tr. at 39.

Plaintiff testified that his father and his landlord helped him to perform household chores and had been doing so for the prior three years. Tr. at 28. He stated he lived with

his 16-year-old son. Tr. at 28. He indicated he was capable of walking around and preparing a bowl of cereal or toast, but could not do his laundry or perform other chores. Tr. at 36. He stated he drove one or twice a week to the store. *Id.* He estimated he spent no more than an hour-and-a-half of an eight-hour period standing. Tr. at 37.

2. The ALJ's Findings

In his decision dated August 10, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.
2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. Since the alleged onset date of disability, July 15, 2011, the claimant has had the following severe impairments: left rotator cuff tear, carpal tunnel syndrome, degenerative disc disease, and depression (20 CFR 404.1520(c) and 416.920(c)).
4. Since the alleged onset date of disability, July 15, 2011, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, I find that since July 15, 2011, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. He is precluded from climbing ladders, ropes, and scaffolds. He may frequently perform bilateral handling and fingering and occasionally reaching overhead with the left upper extremity. He must avoid concentrated exposure to hazards and is limited to understanding, remembering and carrying out simple instructions with no ongoing public interaction.
6. Since July 15, 2011, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. Applying the age categories non-mechanically, and considering the additional adversities in this case, on

June 11, 2015, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Prior to June 11, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on June 11, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant was not disabled prior to June 11, 2015, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13. The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2013, the date last insured (20 CFR 404.315(a) and 404.320(b).

Tr. at 15–22.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to properly consider records after Plaintiff's date last insured ("DLI")[2];

---

[2] According to the Social Security Administration's Program Operations Manual Systems ("POMS"), the DLI is "the last day in the last quarter when disability insured status is met." POMS RS 00301.148. Individuals over age 31 must have at least 20 quarters of coverage over a 40-quarter period, ending with the quarter in which the waiting period begins, to be insured for DIB. POMS RS 00301.120. The amount of earnings necessary to earn a quarter of coverage increases annually based on the average wage index, and an individual may earn between 0 and 4 credits for each year he works. POMS RS 00301.230. Thus, an individual who earns enough to obtain four quarters of coverage in each year over a ten-year period would have 40 quarters of coverage, and his DLI would extend for five years after the year he last worked.

2)      the ALJ did not adequately evaluate the opinion evidence of record; and

3)      the ALJ failed to properly assess Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.      Analysis

          1.      Post-DLI Evidence

Plaintiff argues the ALJ failed to consider medical evidence for the period after his DLI that was relevant to his condition before his DLI. [ECF No. 13 at 6–7]. He maintains the ALJ erroneously determined that his impairments were not disabling prior to the date he required surgery. *Id.* at 7.

The Commissioner argues the ALJ expressly considered the evidence after Plaintiff's DLI and explained how it factored into his decision. [ECF No. 15 at 7–9]. She maintains the ALJ relied on all the evidence to determine Plaintiff's RFC, but that it was Plaintiff's change in age category that caused the ALJ to conclude that he became disabled on June 11, 2015. *Id.* at 8.

"Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012), *citing Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987).

24

"[P]ost-DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." *Id.*, *citing Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969). In *Bird*, the court explained that under its decisions in *Moore* and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005), "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* at 341, *citing Moore*, 418 F.2d at 1226.

Plaintiff had sufficient quarters of coverage to be eligible for DIB through September 30, 2013. Tr. at 15. The ALJ found that Plaintiff's severe impairments included left rotator cuff tear, carpal tunnel syndrome, degenerative disc disease, and depression since his alleged onset date of July 15, 2011. Tr. at 15. He determined that since his alleged onset date, Plaintiff had the RFC to perform light work that required only occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent bilateral handling and fingering; occasional overhead reaching with the left upper extremity; avoidance of concentrated exposure to hazards; and was limited to understanding, remembering, and carrying out simple instructions with no ongoing public interaction. Tr. at 17. The ALJ indicated the evidence dating to Plaintiff's alleged onset date was not indicative of significant physical and mental limitation and that later evidence showed some limitations from his impairments, but did not support a finding of disability. *Id.*

The ALJ's finding that the evidence dating to Plaintiff's alleged onset date did not show significant physical or mental limitation (Tr. at 17), was consistent with a record that contains no medical evidence dating to Plaintiff's alleged onset date. Records between Plaintiff's alleged onset date of July 15, 2011, and his DLI of September 30, 2013, included an emergency room visit in August 2012 for acute pancreatitis (Tr. at 302–10); visits to Dr. Cain in May 2013 for "well controlled" back pain, "improved" hypertension, insomnia, "improved" depression (Tr. at 324–25), and August 2013 medication refills (Tr. at 322); notations that he began mental health treatment on September 16, 2013 (Tr. at 335–38); and lab test results that showed high glucose and low osmolality on September 30, 2013 (Tr. at 275–77). Although the ALJ did not specifically cite these records, he acknowledged that the evidence showed Plaintiff to have limitations from his impairments and to have the same RFC from his alleged onset date through the date of the decision. *See* Tr. at 15 and 17.

Contrary to Plaintiff's assertion (ECF No. 13 at 17), the ALJ did not base his finding that Plaintiff became disabled on June 11, 2015, on his surgical intervention. Instead, the ALJ relied on Medical-Vocational Rule 202.01, which directs a finding of "disabled" for an individual limited to light work who is age 55 or older[5]; has a limited or no education; and has a history of unskilled work. *See* Tr. at 21–22; *see also* 20 C.F.R. Part 404, Subpart P, App'x 2, § 202.01. Thus, the ALJ did not find that Plaintiff's impairments reduced his residual functional capacity at some point after his DLI, but that

---

[5] The ALJ noted Plaintiff "obtained age 55 on July 12, 2015," but stated he applied the age category non-mechanically to consider Plaintiff as an individual of advanced age on June 11, 2015. *See* Tr. at 20.

Plaintiff had the same RFC from his alleged onset date through the date of the decision. *See* Tr. at 17. Because the ALJ assessed the same impairments and RFC for the periods before and after Plaintiff's DLI, the undersigned recommends the court find he adequately considered the evidence as it pertained to Plaintiff's DLI.

### 2.    Opinion Evidence

Plaintiff argues the ALJ did not evaluate the opinion evidence in accordance with the provisions of 20 C.F.R. § 404.1527 and SSR 96-2p. [ECF No. 13 at 8]. He maintains the ALJ did not specify the weight he accorded to all the medical opinions and failed to articulate his rationale for accepting the state agency consultants' opinions over those of the other medical providers. *Id.* at 8–9. He contends the ALJ erred in minimizing Dr. Merrell's findings, ignored Dr. Jaskwhich's statement, and failed to seek clarification from Plaintiff's attorney regarding the signature on the opinion statement from Lowcountry Orthopaedics. [ECF Nos. 13 at 8–9 and 16 at 2].

The Commissioner argues the ALJ evaluated the medical opinion evidence in accordance with the regulations. [ECF No. 15 at 9–11]. She maintains the ALJ explained that he accorded less weight to Dr. Merrell's opinion because Dr. Merrell provided no specific limitations and failed to explain his rationale. *Id.* at 11. She further contends Dr. Merrell's statement was not a medical opinion as contemplated by the regulations. *Id.* at 11–12. She maintains the ALJ addressed the opinion form from Lowcountry Orthopaedics, but was not required to give it more weight because it was a check-off form that failed to address Plaintiff's pre-DLI condition. *Id.* at 12. She further argues that the ALJ did not err in finding that it was unclear that the form was completed by a

physician and that the ALJ cited sufficient reasons for according less weight to the opinion. *Id.* at 13–14.

ALJs must consider all medical opinions of record. 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity" of the claimant's impairments, including his symptoms, diagnosis and prognosis, what he can still do despite his impairments, and his physical or mental restrictions. SSR 96-5p (1996), quoting 20 C.F.R. § 404.1527(a). The regulations require that ALJs accord controlling weight to treating physicians' medical opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.

If the record contains no opinion from a treating physician or if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the

specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it not entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[6]; *see also* 20 C.F.R. § 404.1527(c)(4).

"Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). "Opinions that you are disabled" are among those reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

---

[6] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

Nevertheless, "[t]he adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of disability, including opinions from medical sources about issues reserved to the Commissioner."  SSR 96-5p. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. *Id.*

ALJs are not required to expressly discuss each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (unpublished table decision) (per curiam).

In view of the foregoing authority, the undersigned considers the ALJ's evaluation of the medical opinions of record.

a.      Dr. Merrell's Statement

On May 20, 2014, Dr. Merrell stated he did not believe Plaintiff was capable of working in any capacity because of his pain. Tr. at 360. On April 20, 2015, he indicated he supported Plaintiff's decision to apply for disability. Tr. at 512.

The ALJ stated he considered Dr. Merrell's opinion, but he noted that Dr. Merrell provided no rationale for his statements and declined to assess specific limitations. Tr. at 20.

Dr. Merrell's opinion was an opinion on an issue reserved to the Commissioner because it was conclusory and failed to explain how Plaintiff's conditions affected his abilities. *See Thompson v. Astrue*, 442 Fed. App'x 804, 808 (4th Cir. 2011). Thus, the opinion was entitled to no particular significance, but the ALJ was required to consider the extent to which it was supported by the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); SSR 96-5p.

Dr. Merrell indicated Plaintiff's pain precluded him from working. *See* Tr. at 360. Although the ALJ found that Plaintiff's statements "concerning the intensity, persistence, and limiting effects" of his symptoms were "not entirely credible" (Tr. at 20), he did not specifically consider whether Plaintiff's pain was severe enough to preclude him from working—particularly for the period following Dr. Merrell's first statement. The ALJ noted that Plaintiff reported painless ROM of the back in December 2013 and indicated his pain was controlled with treatment in January 2014, but his discussion of subsequent records indicate only complaints of worsening pain, abnormal diagnostic testing, and multiple surgical procedures. *See* Tr. at 18–19.

Although the ALJ cited Plaintiff's return to work in 2013 and his receipt of unemployment benefits as factors that weighed against a finding of disability (Tr. at 20), it appears these factors also predated Dr. Merrell's statement. A New Hire, Quarter Wage, and Unemployment Query ("NHQWUQ") dated January 22, 2015, shows that

Plaintiff drew $1,469.00 in unemployment benefits for the first quarter of 2013; was hired by "MOR PPM INC." on March 16, 2013; and earned $323.00 in wages for the first quarter of 2013 and $485.00 in wages for the second quarter of 2013. Tr. at 210. Plaintiff testified that he was unable to obtain Medicaid during the period he was drawing employment (Tr. at 30), but he reported to Mr. Poole in April 2014 that he had been approved for Medicaid. Tr. at 345. These facts suggest that Plaintiff was no longer drawing unemployment benefits in April 2014.

In light of the evidence of record, the undersigned recommends the court find the ALJ did not adequately consider or provide an adequate explanation to support his decision to discredit Dr. Merrell's statements.

b.     Dr. Jaskwhich's Statement

On March 9, 2015, Dr. Jaskwhich stated Plaintiff's pain would improve with shoulder surgery, but indicated he would "continue to be on restrictions for lifting" even after his shoulder had healed and would also "be limited as to his overhead lifting." Tr. at 476.

In *Tanner v. Commissioner of Social Sec.*, 602 F. App'x 95, 100 (4th Cir. 2015) (per curiam), the court found the ALJ's failure to expressly assign weight to a medical source's opinion to be harmless error because it was "clear from the ALJ's RFC assessment that he accepted most of" the physician's findings. The court stated "reversing the ALJ's decision solely because he failed to assign weight" to the physician's opinion "would be pointless" because the RFC assessment and the physician's opinion were "largely consistent" and it was "highly unlikely, given the

32

medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability." *Tanner*, 602 F. App'x at 101.

Although the ALJ did not specifically consider Dr. Jaskwich's statement, the RFC he assessed reflects limitations to occasionally lifting 20 pounds; frequently lifting 10 pounds; and occasionally lifting overhead with the left upper extremity. Tr. at 17. The undersigned notes that Dr. Jaskwich's statement contains no specific restriction as to the amount of weight Plaintiff could lift or the frequency with which he could lift overhead. *See* Tr. at 476. In light of Dr. Jaskwich's lack of specificity and the Fourth Circuit's finding that the ALJ adequately considered the medical opinion in *Tanner*, the undersigned recommends the court find the ALJ properly considered Dr. Jaskwich's opinion in assessing Plaintiff's RFC.

### c.    Statement from Lowcountry Orthopaedics

On April 24, 2015, a provider[7] at Lowcountry Orthopaedics completed a form entitled "Medical Assessment of Ability to Perform Work-Related Activities (Physical)." Tr. at 477–78. The provider indicated Plaintiff was incapable of performing sustained work activity for an eight-hour workday and five-day workweek. Tr. at 477. He estimated Plaintiff could frequently and occasionally lift and/or carry less than 10 pounds; could sit for less than two hours in an eight-hour workday; could stand/walk for less than two hours during an eight-hour workday; would need to alternate between sitting and standing

---

[7] The signature on the form is not consistent with that of Dr. Wilson (Tr. at 467 and 468), Dr. Jaskwich (Tr. at 476), or Mr. Schafer (Tr. at 572 and 573), who are the only providers whose signatures appear in the records from Lowcountry Orthopaedics. *See* Tr. at 350–400, 431–68, and 509–73.

every five minutes; would need to lie down three to four times per day; could never bend, stoop, crouch, reach, push/pull, or perform gross manipulation with the bilateral upper extremities; could infrequently perform fine manipulation with the bilateral upper extremities; and would be absent from work on more than four days per month. Tr. at 477–78.

The ALJ recognized that the statement indicated Plaintiff was unable to perform even sedentary work, but gave it no weight because he was unable to determine the source of the illegible signature on the opinion. Tr. at 20.

Pursuant to SSR 96-5p, medical opinions may only be rendered by acceptable medical sources. Because it is unclear who completed the medical assessment form, it is impossible to determine whether it qualifies as a medical opinion or an "other source" opinion. *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). However, because the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) represent basic principles for consideration of all opinion evidence, the ALJ should have looked to them in evaluating the opinion. *See* SSR 06-3p.

It is unnecessary for the court to determine whether the ALJ had an obligation to determine the source of the opinion[8] because his explanation is inadequate whether the assessment came from an acceptable medical source or some other medical source. The ALJ did not address the specific limitations provided and did not consider them in light of the evidence of record. He merely dismissed the opinion because he found its signature

---

[8] Nevertheless, the undersigned notes the identity of the source may be relevant to consideration of the examining relationship, the treatment relationship, the supportability factor, and the specialization factor under 20 C.F.R. §§ 404.1527(c) and 416.927(c).

illegible. Therefore, the undersigned recommends the court find the ALJ failed to adequately consider the opinion in light of the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c) and SSRs 96-5p and 06-3p.

3.    Credibility Assessment

Plaintiff argues the ALJ failed to consider the relevant factors in SSR 96-7p in assessing his credibility. [ECF No. 13 at 9–10]. He maintains the ALJ discounted his credibility merely because he worked for a short period in 2013 and received unemployment benefits. *Id.* at 10.

The Commissioner argues the ALJ accorded appropriate weight to Plaintiff's complaints in finding he was unable to perform his PRW. [ECF No. 15 at 14–15]. She maintains the ALJ considered and discussed all of the medical evidence of record in assessing Plaintiff's credibility. *Id.* at 15. She contends the ALJ reasonably relied on the fact that Plaintiff performed construction work during his alleged period of disability and was laid off from this work for economic reasons—not because of his impairments. *Id.* She argues the ALJ also properly relied on Plaintiff's receipt of unemployment benefits. *Id.* at 16. She maintains the ALJ's decision as a whole reflects that he considered the relevant factors in SSR 96-7p in assessing Plaintiff's credibility. *Id.* at 16–17. She contends the ALJ accorded appropriate weight to Plaintiff's statements in light of the evidence of record. *Id.* at 17.

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the

limitations they impose on his ability to do basic work activities. SSR 96-7p.[9]  If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ is required to consider the claimant's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should also consider the claimant's ADLs; the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate his symptoms; the type, dosage, effectiveness, and side effects of his medications; treatment, other than medication, the claimant receives or has received; any measures other than treatment and medications the claimant uses or has used to relieve his pain or other symptoms; and any other relevant factors concerning the claimant's limitations and restrictions. *Id.*

The ALJ must cite specific reasons to support his finding on credibility, and his reasons must be consistent with the evidence in the case record. *Id.* His decision must

---

[9] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ wrote the following:

> The claimant alleges disability beginning in July 2011. However, he worked for a short period of time in 2013. While this work activity is not considered to be substantial gainful activity, it is indicative of a great[er] level of activity than alleged by the claimant. Subsequently he received unemployment benefits.

Tr. at 20. The ALJ found that the evidence going back to Plaintiff's alleged onset date was not indicative of significant physical or mental limitation and that later-dated evidence showed some limitations from his impairments, but did not support a finding of disability. *Id.*

Although Plaintiff argues to the contrary, it was appropriate for the ALJ to consider the work he performed after his alleged onset date. Work performed by a claimant during a period of alleged disability is relevant to a determination whether the claimant can work at the substantial gainful activity level. 20 C.F.R. §§ 404.1571, 416.971. Even if the work was not substantial gainful activity, it may show that the

claimant was "was able to do more work than [he] actually did." *Id.*; *see also Sigmon v. Califano*, 617 F.2d 41, 42–43 (4th Cir. 1980) ("[T]he [Commissioner] can consider work done by the claimant after the alleged onset of disability as tending to show that the claimant was not then disabled."). Consistent with the relevant case law, the ALJ acknowledged that Plaintiff's work was not substantial gainful activity, but showed he was capable of engaging in a greater level of activity than he alleged. *See* Tr. at 20.

It was also appropriate for the ALJ to consider Plaintiff's receipt of unemployment benefits. This court has repeatedly recognized that an ALJ's consideration of a claimant's receipt of unemployment benefits, in combination with the other evidence of record, is proper under the provisions of 20 C.F.R. §§ 404.1512(b) and 416.912(b). *See Richwalski v. Colvin*, No. 6:13-132-MGL, 2014 WL 2614105, at *11 (D.S.C. Jun. 9, 2014); *Brannon v. Astrue*, No. 1:11-1568-SVH, at *11 (D.S.C. Sept. 4, 2012); *Cook v. Astrue*, No. 0:11-1625-JFA-PJG, 2012 WL 3842572, 2012 WL 1658923, at *6 (D.S.C. Apr. 19, 2012).

The ALJ did not rely exclusively on Plaintiff's 2013 work activity and receipt of unemployment benefits to discount his credibility, but also considered some of Plaintiff's statements to his physicians and the examination findings of minimal symptoms during part of the relevant period. *See* Tr. at 16 (referencing a December 2013 treatment note that indicated Plaintiff denied pain with walking, numbness, and inability to bear weight and a January 2014 treatment note in which he reported only mild symptoms of anxiety), 18 (indicating that in December 2013, Plaintiff denied an inability to bear weight, numbness, pain with walking, swelling, and tingling and demonstrated painless ROM of his back and that in January 2014, he reported his pain and blood pressure were

38

controlled with treatment); and 19 (observing Plaintiff to have normal ROM of his cervical spine, normal ROM of his right upper extremity, normal grip strength on the right, and normal ROM in his hips, knees, ankles, and the small joints of his feet and to report an ability to ambulate without an assistive device on January 28, 2014).

Nevertheless, the ALJ's evaluation of Plaintiff's credibility is not fully supported by the evidence in the case record. The ALJ overlooked his duty to consider the entire record, as evidenced by his improper consideration of the opinion evidence from Dr. Merrell and the provider at Lowcountry Orthopaedics who offered the April 2015 opinion. As discussed in reference to the ALJ's evaluation of Dr. Merrell's opinion, the ALJ cited significant evidence and provided good reasons to support his credibility finding with respect to the earlier time period. However, none of the evidence he cited after Dr. Merrell's opinion supported his conclusion that Plaintiff was not disabled between that time and June 11, 2015. *See* Tr. at 19 (discussing an April 2014 MRI of Plaintiff's lumbar spine that showed moderate right L3 neural foraminal stenosis, moderate-to-severe degeneration at L4-5 with marked lateral recess compromise, moderate-to-severe right L4 neural foraminal stenosis, and moderate-to-severe degeneration at L5-S1; an April 2014 MRI of Plaintiff's cervical spine that revealed moderate-to-severe central canal stenosis at C4-5 and C5-6 with moderate flattening of the spinal cord on the right, mild central canal stenosis at C3-4, and severe right C5 and C6 neural foraminal stenosis; a May 2014 administration of bilateral L5-S1 transforaminal ESIs; a May 2014 EMG/NCS report that showed right L5 radiculopathy and bilateral median neuropathy at the wrists; a June 2014 C4-5 and C5-6 anterior

cervical discectomy, decompression, and anterior cervical interbody fusion; Plaintiff's August 2014 complaints of loss of ROM, interscapular pain, low back pain, and bilateral leg pain; a September 2014 right carpal tunnel release and left carpal tunnel corticosteroid injection; a December 2014 anterior interbody fusion of L4-5 and L5-S1; April 2015 complaints of continued pain in his back, left shoulder, and arm and treatment that included physical therapy and chiropractic care; and a May 2015 left shoulder arthroscopy with extensive debridement of the labrum, synovial tendon, and bursa). This evidence contains consistent reports of symptoms and substantial objective evidence that arguably corroborate Plaintiff's statements. However, the ALJ failed to explain why this evidence was more consistent with the RFC he assessed than with Plaintiff's complaints of disabling pain and the statements of his medical providers. In light of the foregoing, the undersigned recommends the court find the ALJ failed to "build an accurate and logical bridge" between the evidence he cited and his conclusion that Plaintiff's statements were not credible. See *Monroe*, 826 F.3d at 189.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

October 12, 2016                                  Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).